**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULLEN AUTOMOTIVE, INC. and ULYSSES NOVOA,<br><br>                Plaintiffs,<br><br>    - against -<br><br>TD AMERITRADE, INC., CHARLES SCHWAB & CO., INC., NATIONAL FINANCIAL SERVICES, LLC and JOHN DOES 1 THROUGH 10,<br><br>                Defendants. | Index No.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Mullen Automotive, Inc. ("Mullen" or the "Company") and Ulysses Novoa ("Novoa") (collectively the "Plaintiffs"), by and through their undersigned attorneys, for their Complaint against TD Ameritrade, Inc. ("TD"), Charles Schwab & Co., Inc. ("Schwab"), National Financial Services, LLC ("NFS") (collectively the "Defendants") and John Does 1 through 10 ("John Doe Defendants"), allege upon personal knowledge, information and belief, and an investigation by counsel as follows:

## I.    <u>SUMMARY OF ALLEGATIONS</u>

1.    This case arises from a short selling scheme by Defendants TD, Schwab, NFS and the John Doe Defendants to manipulate the market price of Mullen securities between May 4, 2023 and August 25, 2023 ("Relevant Period"). In furtherance of their scheme, Defendants and the John Doe Defendants

unlawfully: (1) sold fictitious Mullen shares in advance of the issuance of new shares by the Company for either their own proprietary accounts or their customers' accounts; and/or (2) removed without authorization Mullen shares from their customers' accounts to lend to other market participants or to cover their own short positions until new shares were issued.  By creating and using these fictitious and unauthorized shares, Defendants and the John Doe Defendants unlawfully increased the supply of Mullen shares that were available for short selling, thus injecting false and misleading information into the market.  The schemes of both the Defendants and the John Doe Defendants have devastated Mullen's share price and crippled its business.

2.      Mullen is an American automotive company headquartered in Brea, California and incorporated in Delaware. Its products include both passenger and commercial electric vehicles.  On November 5, 2021, Mullen began trading on Nasdaq[1], using the symbol MULN.

3.      The devastating impact of Defendants' and the John Doe Defendants' manipulation schemes on Mullen's share price is demonstrable.  During the Relevant Period, Mullen's share price was manipulated downward from $1.47 to $0.113 per share. As the market price of the Company's stock was driven

---

[1] The Nasdaq Stock Market is an American stock exchange based in New York City. It is the most active stock trading venue in the United States by volume and ranked second on the list of stock exchanges by market capitalization of shares traded, behind the New York Stock Exchange.

downward by Defendants' and the John Doe Defendants' manipulation schemes, Mullen was forced to execute a reverse stock split[2] to prevent the stock from being delisted by Nasdaq.  On May 4, 2023, Mullen executed a 25-to-1 reverse split of its shares, which resulted in a reduction of the 3.7 billion shares outstanding to 152 million shares.  The reverse split restored the price of Mullen's share price above $1.00,  putting its stock price back into compliance with Nasdaq listing requirements.

4.      During the Relevant Period, Defendant TD unlawfully sold approximately 19 million Mullen shares, Defendant Schwab unlawfully sold approximately 7.6 million Mullen shares, and Defendant NFS unlawfully sold approximately 7.8 million Mullen shares.  In all cases, these shares were either fictitious shares and/or fully paid for customer shares that should have been held by the broker for safekeeping.[3]  In total, the Defendants unlawfully sold over 34 million fictitious Mullen shares and/or fully paid-for shares owned by Mullen shareholders.

---

[2] A reverse stock split is a type of corporate action that consolidates the number of existing shares of stock into fewer higher-priced shares. A reverse stock split divides the existing total quantity of shares by a number such as five or ten, which would then be called a 1-for-5 or 1-for-10 reverse split, respectively. A reverse stock split does not directly impact a company's value only its stock price.

[3] The Customer Protection Rule (17 C.F.R. §240.15c3-3), is intended to protect customer funds and fully paid for securities by depositing these assets in segregated, good control accounts and prohibiting their use by brokers for any purpose including lending, short selling and working capital for its operations. Rule 15c3-3 Adopting Release, Exch. Rel. No. 9775, 1972 WL 125434, at *1 (Sept. 14, 1972). According to the SEC, the Customer Protection Rule is a "fundamental protection for investors and imposes lines that can never be crossed."

5.     During the Relevant Period, Defendants and the John Doe Defendants continued to place enormous downward pressure on Mullen's share price by unlawful short selling, forcing Mullen to execute a second reverse split at 10-to-1 at the end of trading on August 10, 2023.  This second reverse split decreased Mullen's outstanding shares from approximately 1.8 billion to 181 million.  This reverse split also restored the price of Mullen's share price above $1.00, putting its share price back into compliance with Nasdaq listing requirements.

6.     Defendants and the John Doe Defendants created fictitious Mullen shares that were used to facilitate unlawful short selling.  Defendants' conduct injected false and misleading information into the market by indicating that there were more Mullen shares available for trading than existed.  Defendants and the John Doe Defendants therefore prevented Mullen's share price from being determined by the natural interplay of the forces of supply and demand.  This lawsuit seeks compensatory damages and injunctive relief from Defendants and the John Doe Defendants arising from their unlawful conduct in violation of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b-5 promulgated thereunder.

## II.     <u>JURISDICTION AND VENUE</u>

7.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa]; and 28 U.S.C. §

1331.  This Court also has jurisdiction over the state law claims under 28 U.S.C. §

1367 because these claims are so related to the federal claim that they form part of

the same case or controversy.

8.      Venue is proper in the Southern District of New York pursuant to 28

U.S.C. § 1391 and Section 27 of the Exchange Act, in that many of the acts,

transactions and occurrences alleged herein occurred in this District, and all

Defendants conducted business here, in connection with the events described

herein.

9.      Defendants directly or indirectly made use of the means or

instrumentalities of interstate commerce including the mails, or the facility of a

national securities exchange in connection with the conduct alleged herein.  Where,

as here, claims involve securities listed or traded on domestic stock exchanges,

Section 27 of the Exchange Act provides for personal jurisdiction over those

parties who trade on the exchange.

## III.   THE PARTIES

### A.    Plaintiffs

***Plaintiff Mullen***

10.     Plaintiff Mullen is an American electric vehicle manufacturer.  Mullen

is incorporated in the State of Delaware, with its principal place of business in

Brea, California.  The Company's securities are currently listed on Nasdaq, and

have been traded on Nasdaq, NYSE Arca, and BATS, as well as other electronic execution venues, all of which are either located in, or conduct business operations in, New York City.

### Plaintiff Novoa

11.     Plaintiff Novoa is an investor in Mullen securities who resides in the State of California.

12.     During the Relevant Period, Novoa bought and sold Mullen shares on stock exchanges, as well as other electronic execution venues located in New York City.

### B.     Defendants[4]

### Defendant TD

13.     Defendant TD is a global financial services company headquartered at 200 South 108th Avenue, Omaha, Nebraska.  Defendant TD is incorporated under the laws of the State of New York, with multiple offices located in New York City. Defendant TD is a subsidiary of the Charles Schwab Corporation, and is registered as a broker-dealer with the SEC.

---

[4] Whenever reference is made to any act, device, contrivance, or scheme to manipulate Mullen securities by any of the Defendants, the allegation is intended to also include the subsidiaries, affiliates, sister companies, agents and representatives of that Defendant, whose identities and specific involvement in this market manipulation case are unknown at this time.

14.     During the Relevant Period, Defendant TD traded Mullen securities on national exchanges and other trading venues that are in New York City, for its own proprietary accounts and for the accounts of its customers and clients. Defendant TD engaged in the manipulative trading alleged herein on these exchanges during the Relevant Period.

### Defendant Schwab

15.     Defendant Schwab is a global financial services company that is headquartered in Westlake, Texas.  Defendant Schwab has a New York office located at 100 Broadway, New York, NY 10005.  Defendant Schwab is incorporated under the laws of the State of Delaware and is a subsidiary of the Charles Schwab Corporation.  Defendant Schwab is registered as a broker-dealer with the SEC.

16.     During the Relevant Period, Defendant Schwab traded Mullen securities on national exchanges and other trading venues that are in New York City, for its own proprietary accounts and for the accounts of its customers and clients. Defendant Schwab engaged in the manipulative trading alleged herein on these exchanges during the Relevant Period.

### Defendant NFS

17.     Defendant NFS is a global financial services company that is headquartered in Boston, MA, with offices located at 245 Summer Street, Boston,

MA 02210.  Defendant NFS has a New York office located at 200 Liberty Street, New York, NY, 10281.  Defendant NFS is incorporated under the laws of the State of Delaware and is registered as a brokerage firm with the SEC.

18.     During the Relevant Period, Defendant NFS traded Mullen securities on national exchanges and other trading venues that are in New York City, for its own proprietary accounts and for the accounts of its customers and clients. Defendant NFS engaged in the manipulative trading alleged herein on these exchanges during the Relevant Period.

### *John Doe Defendants*

19.     The John Doe Defendants 1-10 are broker-dealers who engaged in unlawful abusive short selling and whose identities in this market manipulation case are presently unknown because trading and clearing are anonymous to the public.  Only after discovery is taken will Plaintiffs know the identities of all the John Doe Defendants.

## IV.   DEFENDANTS' AND THE JOHN DOE DEFENDANTS' MARKET MANIPULATION SCHEMES INVOLVED ABUSIVE SHORT SELLING THAT VIOLATED REGULATION SHO AND RULES 15C3-3 AND 14B-1 OF THE EXCHANGE ACT

20.     It is a well-established economic principle that increased supply decreases prices and increased demand increases prices.  Like every participant in the stock market, Mullen and Novoa had and continue to have the right to rely

upon this principle and the integrity and efficiency of the markets in which Mullen's securities are traded. Specifically, Mullen has the right to have the price of its securities determined by the natural interplay of the forces of supply and demand, rather than by the unlawful conduct of market manipulators, like Defendants and the John Doe Defendants. In determining whether activity falls outside the natural interplay of the forces of supply and demand, consideration is given to whether the alleged manipulative activity sends a false pricing signal or injects false information into the market that artificially affects market activity.

21.     By Defendants unlawful (a) removal and use of Mullen shares from customer accounts that should have been segregated and restricted for safekeeping; and (b) creation and sale of fictitious shares that were not authorized by Mullen, Defendants injected false and misleading information into the marketplace concerning the supply and trading volume of Mullen's securities. Defendants short selling is considered "Synthetic Naked Short Selling"[5] due to the use of customer and fictitious shares, to conceal "Fails-to-Deliver" ("FTD" or "Fails").[6]

---

[5] "Synthetic Naked Short Selling" is an unlawful form of short selling because it uses shares to cover the transaction that are not lawfully "loanable." As a result, the transaction is considered "naked."

[6] "Fails-to-Deliver" refers to the failure by any short seller to deliver shares to the buyer at settlement of the short sale, or to return borrowed shares to a lender upon demand.

22.     The John Doe Defendants sold short Mullen shares without borrowing them, an unlawful practice referred to as "Naked Short Selling."[7]  When parties illegally engage in Naked Short Selling, they are not complying with the legal requirement to borrow a stock or determine that it can be borrowed before they sell it short—and thus, are trading shares that have not been affirmatively determined to exist.

23.     By engaging in Naked Short Selling, the John Doe Defendants created fictitious shares that were not authorized by Mullen. As a result, this injected false and misleading information into the marketplace concerning the supply and trading volume of Mullen's securities. This in turn created Fails-to-Deliver.  Fails-to-Deliver are a major indicator of Naked Shorting Selling.

24.     The false and misleading market signals that Defendants and the John Doe Defendants injected into the market during the Relevant Period by unlawfully using Synthetic Naked Short Selling and Naked Short Selling, attracted other traders to "pile-on" the extremely heavy selling that was occurring.  As the volume of selling increased over the Relevant Period, it further drove down the market price of Mullen shares from a high of $1.47 a share, to a low of $0.11 a share.

---

[7] In a Naked Short Sale, the seller does not borrow or arrange to borrow the securities in time to make delivery to the buyer within the standard two-day settlement period. As a result, the seller Fails-to-Deliver securities to the buyer when delivery is due.  Despite being made illegal after the 2008–09 financial crisis, Naked Short Selling continues to happen because of loopholes in rules and discrepancies between paper and electronic trading systems.

Defendants' and the John Doe Defendants' unrelenting and unauthorized use of

fictitious shares and/or restricted customer shares for unlawful short selling

continuously drove Mullen's share price downward until the Company was unable

to comply with Nasdaq's listing requirements.  In order to avoid being delisted, on

May 4, 2023 and again on August 10, 2023, Mullen was forced to complete two

reverse splits of its shares.

25.     Defendants' and the John Doe Defendants' manipulative conduct was

either intentional or reckless, because as registered broker-dealers, each Defendant

knew or recklessly ignored their obligations to comply with all federal securities

laws and industry rules and regulations.  The Defendants and the John Doe

Defendants are all subject to comprehensive regulations promulgated by the United

States Securities and Exchange Commission ("SEC") and the Financial Industry

Regulating Authority ("FINRA.")[8]  These regulations are designed to protect

customer assets.

26.     Defendants and the John Doe Defendants were also obligated to

comply with mandatory procedures governing compliance, supervision, and

financial risk management that are designed to detect and prevent violations of the

---

[8]FINRA is a private American corporation that acts as a self-regulatory organization (SRO) that regulates member brokerage firms and exchange markets.  FINRA's mission is to protect investors by making sure the U.S. securities industry operates fairly and honestly. The U.S. government agency that acts as the ultimate regulator of the U.S. securities industry, including FINRA, is the SEC.

securities laws, regulations, and rules.  The combination of the regulatory and financial risk management described above made it virtually impossible that Defendants' and the John Doe Defendants' managers and supervisors, inadvertently "overlooked" (1) the discrepancies between Mullen shares on deposit at the Depository Trust Clearing Corporation ("DTCC") [9] and customers' shares Defendants reportedly had in their possession, or (2) the Fails-to-Deliver created by the John Doe Defendants' Naked Short Selling.  Rather, a strong inference can be drawn that (a) the Defendants knowingly and intentionally concealed their unlawful use of customer shares in order to perpetuate their scheme and receive millions of dollars in illicit fees from unlawfully lending or trading their customer segregated shares; and (b) the John Doe Defendants knowingly or recklessly ignored the Fails being created by their Naked Short Selling of fictitious shares.

### A.   Abusive Short Selling and Reg SHO

27.     Not all short selling is unlawful.  Short selling is lawful when sellers, who believe the price of a security will decline, borrow shares from their brokers and sell them on the open market hoping to buy them back for a profit if the price declines. Shares must be borrowed because traders cannot lawfully sell shares that do not exist. Closing a short position requires a short seller to buy the shares back

---

[9] The DTCC is an American post-trade financial services company providing clearing and settlement services to the financial markets. It performs the exchange of securities on behalf of buyers and sellers and functions as a central securities depository by providing central custody of securities.

on the open market.  The short seller earns as profit the difference between the higher price at which the borrowed shares were sold and the lower price it paid for the replacement shares, net of any costs to borrow the shares.  If the price of the stock increases, however, the short seller takes a loss.

28.    Naked shorting is the illegal practice of short-selling shares that have not been affirmatively determined to exist.  Naked short sellers, like the John Doe Defendants, (a) affect short sales without borrowing the shares that they are selling, which saves the expense associated with borrowing, and (b) fail to deliver the shares to the buyer at settlement. Naked Short Selling expands the supply of shares of an issuer's stock beyond the amount of authorized, tradable shares in the market. This creates fictitious shares,[10] which distorts the price of the stock and creates Fails-to-Deliver.  Fails-to-Deliver cause violations of SEC Regulation SHO, 17 C.F.R. § 242, 200 ("Reg SHO").[11]  The SEC enacted Reg SHO in part to curb the practice of Naked Short Selling.

---

[10] For purposes of this complaint the words fictitious, phantom, fake and or unauthorized are used interchangeably.

[11] Regulation SHO – 17 CFR §242.200 - was promulgated by the SEC to promote market stability and preserve investor confidence by establishing uniform "locate" and "close-out" requirements that are intended to prevent naked short selling.  Specifically, Rule 203(b)(1) and (2) of Reg SHO requires a broker-dealer to "locate" the security before executing a short sale order, and thus have reasonable grounds to believe that the security can be lawfully borrowed before delivery is due. Rule 204 of Reg SHO requires brokers-dealers to take action to "close out" failure to deliver positions.  "Closing out" requires the broker-dealer to purchase or borrow securities of like kind and quantity.  The participant must close out a fail-to-deliver for a short sale transaction by no later than the beginning of regular trading hours on the settlement day following the settlement date (the settlement date is referred to as T+2).

29.     Synthetic Naked Short Selling also circumvents the requirements  of Reg SHO and violates the Customer Protection Rule by the unauthorized use of segregated customer shares which brokers, like the Defendants, are required to maintain for safekeeping.  By engaging in Synthetic Naked Short Selling, the broker unlawfully removes shares from the customer safekeeping accounts to make delivery on the short sales.  Despite the difference between Naked Short Selling and Synthetic Naked Short Selling, the effect is the same: it expands the supply of the issuer's stock beyond the authorized share count levels, and injects false and misleading information into the market causing manipulation of the stock price.

30.     Reg SHO was enacted by the SEC to preclude naked short sellers from engaging in "Bear Raids" [12] by (1) reducing the supply of shares available for selling short from an infinite supply to the number of shares that have actually been issued by an issuer and that can reasonably be borrowed by a short seller; and (2) by imposing restrictions against new short sales (via the "Penalty Box" [13] and

---

[12] A "Bear Raid" is where a security is sold short in an effort to drive down the price of the security by creating an imbalance of sell-side interest.  Unrestricted short selling can exacerbate a declining market in a security by increasing pressure from the sell-side, eliminating bids, and causing a further reduction in the price of a security by creating an appearance that the security price is falling for fundamental reasons. *See* Proposed Rule: Short Sales, SEC Release No. 34-48709, 17 CFR Parts 240 and 242, https://www.sec.gov/rules/proposed/34-48709.htm

[13] The Penalty Box provision of Reg SHO requires a clearing broker with persistent fail-to-deliver positions to immediately close out the fail to deliver position by purchasing shares in the open market. The clearing dealer may not accept any short sale orders without first borrowing the securities until the fail-to-deliver is resolved.

Threshold Lists[14]) if there are accumulated Fails-to-Deliver in a particular stock. Reg SHO was intended to disrupt the Naked Short Sellers' leverage.

31.     The SEC's twin remedies recognize that naked short sales look like lawful short sales, which not only can depress the share price by expanding the supply of shares sold, but also signal to the market that some party is shorting the stock in large amounts and therefore something is materially wrong with the stock. This can cause a "snowball effect," drawing in more legitimate short sellers and encouraging current shareholders to sell – all of which combine to depress the price of the security.

> ### B.     Examples of John Doe Defendants' Fails-to-Deliver and Unlawful use of Newly Issued Shares in Violation of <u>Reg SHO</u>

32.     The John Doe Defendants unlawfully used Mullen's issuance of new shares of Mullen securities to close out Fails-to-Deliver created by their Naked Short Selling.  Newly issued Mullen shares were used to reduce or eliminate existing Fails in violation of the Locate, Borrow, and Close Out requirements of Reg SHO (Rules 203 and 204 of Reg SHO). [15] The following two tables, taken

---

[14] A Threshold List, also known as a Regulation SHO Threshold Security List, is a list of securities whose transactions failed to clear for five consecutive settlement days at a registered clearing agency. Regulators review this information as part of their efforts to detect market manipulation.

[15] As the SEC Fail-to-Deliver numbers are only publicly available in the aggregate, it is impossible to determine the identities of the John Doe Defendants without taking third party discovery.

from information publicly reported by the SEC,[16] demonstrate how the reduction in the number of Fails coincided with Mullen's issuance of new shares deposited at DTCC[17] ("Newly Issued Shares Deposited at DTCC").

**Example 1**

| Settlement Date | Shares at DTCC | Newly Issued Shares Deposited  at DTCC | SEC Fails |
|---|---|---|---|
| 6/23/2023 | 476,937,515 | 1,089,610 | 65,292,679 |
| 6/26/2023 | 509,038,873 | 32,101,358 | 47,041,469 |
| 6/27/2023 | 509,038,873 | 0 | 5,643,339 |
| 6/28/2023 | 546,949,856 | 37,910,983 | 46,994 |

33.    As reflected in Example 1, a Fail-to-Deliver of 65,292,679 Mullen shares was created on settlement date June 23, 2023 and was subsequently reduced to 46,994 shares as 32,101,358 and 37,910,983 newly issued Mullen shares were deposited at DTCC on June 26, 2023 and June 28, 2023 respectively.

Example 2

| Settlement Date | Shares at DTCC | Newly Issued Shares Deposited at DTCC | SEC Fails |
|---|---|---|---|
| 6/30/2023 | 712,421,112 | 59,984,886 | 58,602,938 |
| 7/3/2023 | 767,421,111 | 54,999,999 | 43,717,164 |
| 7/5/2023 | 779,726,392 | 12,305,281 | 12,379,464 |
| 7/6/2023 | 970,230,196 | 190,503,804 | 12,409,464 |
| 7/7/2023 | 970,230,196 | 0 | 11,461,584 |
| 7/10/2023 | 982,640,897 | 12,410,701 | 15,334,517 |
| 7/11/2023 | 1,160,036,871 | 177,395,974 | 17,572,399 |
| 7/12/2023 | 1,220,036,871 | 60,000,000 | 35,219 |
| 7/13/2023 | 1,272,581,580 | 52,544,709 | 0 |

---

[16] SEC fail data is publicly available on the SEC website.

[17] DTCC data was obtained from the DTCC by Mullen.

34.     As reflected in Example 2, a Fail-to-Deliver of 58,602,938 shares was created on settlement date June 30, 2023 and was subsequently reduced to 0 shares on July 13, 2023 as 620,145,354 newly issued shares were deposited at DTCC between June 30, 2023 and July 13, 2023.

35.     Based on these examples, a strong inference can be drawn that the John Doe Defendants were using newly issued Mullen shares to close out pre-existing Fails-to-Deliver of Mullen shares, which had the effect of circumventing, and thereby violating Rules 203 and 204 of Reg SHO.

### C.     Imbalances in Violation of Rule 15c3-3 and Rule 14b-1 of the Exchange Act

36.     As part of their scheme to manipulate Mullen stock, each Defendant overreported to Broadridge Financial Services, Inc., ("Broadridge"), the number of "Beneficially Owned" [18] Mullen shares that were actually on deposit at DTCC. Persistent "Imbalances" [19] that existed during the Relevant Period indicate internal

---

[18] Beneficially owned shares are fully paid for by the customer and held by their broker in a segregated safekeeping account. They cannot be used for any purpose by the broker without the customer's written authorization.  When a fully paid security is loaned for delivery to a buyer in a short sale, the purchaser of the borrowed shares becomes the beneficial owner of the shares instead of the original owner who loaned the shares, even though the original owner has not sold the shares. This is because a share can only have one beneficial owner at a time.

[19] Imbalances are the difference between the beneficially owned shares reported to Broadridge by brokers less the amount of shares on deposit at the DTCC.  If the broker-dealer has fewer shares of a security in its possession or control than are owned by its customers, it has a "deficit" position in this security; if the broker-dealer has more shares of a security in its possession or control than is required, it has "excess" shares of this security." Brokers are required to keep a log or record of all deficit positions, and the steps being taken to rectify them, which means that a persistent recurring deficit cannot be an inadvertent oversight.

Fails-to-Deliver and are a reliable barometer of Synthetic Naked Short Selling activity.

37.     Broker-dealers, like the Defendants, maintain a Stock Record[20] showing how many shares each customer beneficially owns and how many shares the broker has under "Good Custody and Control" at DTCC. This information is important to both the customer and to the issuer because it is intended to provide accurate share counts to distribute shareholder voting materials (proxies) and dividends.

38.     The Defendants concealed their use of customer shares by intentionally overreporting the amount of shares they claimed that they had in their possession to Broadridge, which was charged as Mullen's agent with keeping track of the count of Beneficially Owned shares of Mullen's stock.  Over the course of the Relevant Period, each Defendant maintained persistent and significant Imbalances.

---

[20] Stock Record is an electronic listing of securities held by a brokerage firm on behalf of customers.  The Stock Record displays the account numbers of the real and beneficial owners, and the amounts and locations of all securities held by the firm.  Before widespread computerization, stocks were represented by physical share certificates, and settling trades involved physically delivering share certificates from the seller to the buyer. Stock Records replaced the need for physical certificates by holding stocks in street name and establishing a master record of who beneficially owns what.  The Stock Record is regularly reconciled to account for new sales and purchases and updated accordingly.  The Stock Record must be updated any time a trade is executed.  Transactions reflected in the broker-dealer's stock record are then included in DTCC's electronic "book-entry" system of accounting, which is designed to negate the need for the transfer of physical stock certificates.  The electronic book-entry system operates by decreasing the selling participant's account in the number of shares that are sold and increasing the purchasing participant's account by the same amount.  These bookkeeping entries do not involve the physical movement of stock in or out of DTCC accounts.

39.     Under SEC Rule 15c3-3, the Defendants were required to maintain Good Custody and Control of customers' holdings of Mullen stock, by segregating those shares and restricting their use for general firm purposes, including short selling.  Despite the requirement to safeguard these Mullen shares, the Defendants either lent these customers' shares to other market participants (i.e., broker-dealers and hedge funds) to cover their own short sales for a borrowing fee or for Defendants' own proprietary accounts short selling, or both.  Had the Defendants not used Mullen shares belonging to customers to cover short sales, the short sellers, either the Defendants themselves or the borrowers they lent to, would have "Failed" or been unable to deliver shares when settling the trades in violation of Reg SHO.

40.     Under Exchange Act Rule 14b-1, broker-dealers, like the Defendants, are required to report information about Beneficial Owners to issuers, like Mullen, at least annually or more frequently upon request.  To facilitate the collection and reconciliation of this information, almost 95% of all issuers in the United States use Broadridge to communicate with broker-dealers and maintain a count of the Beneficially Owned shares.

41.     During the Relevant Period, despite multiple SEC and FINRA rules requiring each Defendant to maintain accurate records of Beneficial Ownership, the Defendants regularly and persistently reported to Broadridge, Beneficial Owner

share counts that materially exceeded the number of Beneficially Owned Mullen shares they held at DTCC.

42.     These Imbalances created regulatory risks for each Defendant, because, among other things, the "missing" customer shares at DTCC would have caused the firm to be in continuous violation of the SEC's Rule 15c3-3, which requires that the firm have Good Custody and Control of customer shares in segregated accounts.

43.     Shares on deposit at DTCC were authorized by Mullen. When there are more shares being reported by brokers, like Defendants, to Broadridge then are on deposit in the broker's account at DTCC, these shares are fictitious and neither real nor legitimate.  To further their scheme, the Defendants knowingly or recklessly ignored their responsibility to reconcile (a) the number of Beneficially Owned Mullen shares reported to Broadridge, with (b) the number of shares that were held on deposit at their accounts at DTCC.  This failure to reconcile facilitated the creation of Synthetic Naked Short Selling in violation of Reg SHO, which gives rise to a claim under Section 10(b) and Rule 10b-5.

44.     The Imbalance deficit created fictitious Mullen shares. Although these Mullen shares were (a) credited to the customers' accounts, (b) the customers paid for them, and (c) the shares appeared on customers' monthly brokerage statements as being in the customers' account and available to the customers, there were

insufficient actual authorized shares in the broker's DTCC account to fulfill its obligation to its customers as required by Rule 15c3-3.

45.     A large and persistent Imbalance, which is the functional equivalent of a Fail-to-Deliver, indicates that the Defendants were not maintaining Good Custody and Control of customer shares in violation of Rule 15c3-3.  The Defendants' Imbalances were both large and persistent throughout the Relevant Period.

46.     Throughout the Relevant Period, the total Imbalance of all brokers ranged from approximately 19 million shares to approximately 54 million shares and the Defendants' combined Imbalance deficit ranged from approximately 13 million to approximately 39 million shares, which was approximately 70% of the total Imbalance.

47.     Based on the length of time that the Imbalances persisted; the size of the Imbalances; the operational and financial exposure created by the Imbalances due to the regulatory scrutiny paid to the calculation of net capital balances by FINRA and the SEC; and the SEC's particular focus in recent years on large-scale violations of the Rule 15c3-3, each Defendant knew or recklessly ignored that its Imbalance of Mullen shares was neither accidental nor inadvertent.

48.     The table below reflects the total aggregate bi-weekly Imbalances between the Mullen shares that were on deposit at DTCC and the Beneficially Owned shares that were reported by broker-dealers to Broadridge.[21]

| Report Date | Total Imbalance | Imbalance Share Change | Imbalance Percentage Change |
|---|---|---|---|
| 5/31/2023 | (19,348,033) | | |
| 6/15/2023 | (20,085,388) | (737,355) | 3.81% |
| 6/30/2023 | (54,769,239) | (34,683,851) | 172.68% |
| 7/14/2023 | (32,586,738) | 22,182,501 | -40.50% |

49.     During the period of June 15, 2023 to June 30, 2023, the Imbalance total increased by over 34 million shares or approximately 172%. During the period of June 30, 2023 to July 14, 2023, the Imbalance total decreased by approximately 22 million shares. This decrease in the amount of Imbalance shares coincided with the issuance of over 600 million shares into DTCC by Mullen.

### D.     Examples of Each Defendant's Imbalances

50.     The following are examples of each Defendant's Imbalances in connection with this scheme.

---

[21] Mullen obtained this data from Broadridge.

### 1. Defendant TD

| Report Date | Shares Reported to Broadridge | Shares on Deposit at DTCC | Imbalance (Broadridge minus DTCC) | Imbalance Share Change | Imbalance Percentage Change |
|---|---|---|---|---|---|
| 5/31/2023 | 35,581,526 | 28,875,577 | (6,705,949) | | |
| 6/15/2023 | 49,216,540 | 42,958,843 | (6,257,697) | 448,252 | -6.68% |
| 6/30/2023 | 135,118,698 | 116,307,864 | (18,810,834) | (12,553,137) | 200.60% |
| 7/14/2023 | 191,781,624 | 188,185,311 | (3,596,313) | 15,214,521 | -80.88% |

51.     This table reflects for each Report Date, the number of Mullen shares Defendant TD reported to Broadridge, the number of Mullen shares held at DTCC in Defendant TD's account, it's Imbalance (the number of Broadridge reported shares less the shares actually at DTCC), the Imbalance Share Change between reporting periods, and the Imbalance Percentage Change between reporting periods. Defendant TD maintained persistent large Imbalances between the amount of Mullen shares in its account at DTCC and the number of beneficially owned Mullen shares that it reported to Broadridge during the Relevant Period.

52.     During the period of June 15, 2023 to June 30, 2023, Defendant TD's Imbalance total increased by over 12 million Mullen shares or approximately 200%. During the period of June 30, 2023 to July 14, 2023, Defendant TD's Imbalance total decreased by approximately 15 million Mullen shares. This

decrease in the Imbalance amount of Mullen shares coincided with the issuance of over 600 million shares into DTCC by Mullen.

53.     A strong inference can be drawn that Defendant TD used the newly issued Mullen shares to reduce their Imbalance.  A strong inference can also be drawn that Defendant TD was unlawfully crediting customer accounts with fictitious Mullen shares in violation of Rule 15c3-3, as Defendant TD anticipated the issuance of new Mullen shares. A strong inference can also be drawn that Defendant TD was also violating Rule 14b-1 by overreporting to Broadridge the current number of beneficially owned shares of Mullen that it was holding in safekeeping accounts for its customers.  In fact, there were insufficient actual Mullen shares in Defendant TD's DTCC account to fulfill its obligation to its customers.

54.     Defendant TD then deposited actual Mullen shares into customer safekeeping accounts when new Mullen shares were issued.  This conduct continued throughout the Relevant Period.

### 2.  Defendant Schwab

| Report Date | Shares Reported to Broadridge | Shares on Deposit at DTCC | Imbalance (Broadridge minus DTCC) | Imbalance Share Change | Imbalance Percentage Change |
|---|---|---|---|---|---|
| 5/31/2023 | 26,361,858 | 24,360,223 | (2,001,635) | | |
| 6/15/2023 | 29,253,263 | 27,058,194 | (2,195,069) | (193,434) | 9.66% |
| 6/30/2023 | 58,260,306 | 50,613,077 | (7,647,229) | (5,452,160) | 248.38% |
| 7/14/2023 | 89,823,184 | 84,686,782 | (5,136,402) | 2,510,827 | -32.83% |

55.     This table reflects for each Report Date, the number of Mullen shares Defendant Schwab reported to Broadridge, the number of Mullen shares held at DTCC in Defendant Schwab's account, its Imbalance (the number of Broadridge reported shares less the shares actually at DTCC), the Imbalance Share Change between reporting periods and the Imbalance Percentage Change between reporting periods.  Defendant Schwab maintained persistent large Imbalances between the amount of Mullen shares in its account at the DTCC and the number of beneficially owned Mullen shares that it reported to Broadridge during the Relevant Period.

56.     During the period of June 15, 2023 to June 30, 2023, Defendant Schwab's Imbalance total increased by over 5.4 million Mullen shares or approximately 248%. During the period of June 30, 2023 to July 14, 2023, Defendant Schwab's Imbalance total decreased by approximately 2.5 million Mullen shares. This decrease in the Imbalance amount of Mullen shares coincided with the issuance of over 600 million shares into DTCC by Mullen.

57.     A strong inference can be drawn that Defendant Schwab used the newly issued Mullen shares to reduce their Imbalance.  A strong inference can also be drawn that Defendant Schwab was unlawfully crediting customer accounts with fictitious Mullen shares in violation of Rule 15c3-3, as Defendant Schwab

anticipated the issuance of new Mullen shares. Defendant Schwab was also

violating Rule 14b-1 by overreporting to Broadridge the current number of

beneficially owned shares of Mullen that it was holding in safekeeping accounts

for its customers. There were in fact insufficient actual Mullen shares in Defendant

Schwab's DTCC account to fulfill its obligation to its customers. Defendant

Schwab then deposited actual Mullen shares into customer safekeeping accounts

when new Mullen shares were issued.  This conduct continued throughout the

Relevant Period.

### 3.  Defendant NFS

| Report Date | Shares Reported to Broadridge | Shares on Deposit at DTCC | Imbalance (Broadridge minus DTCC) | Imbalance Share Change | Imbalance Percentage Change |
|---|---|---|---|---|---|
| 5/31/2023 | 16,761,105 | 14,979,555 | (1,781,550) | | |
| 6/15/2023 | 20,375,102 | 19,650,857 | (724,245) | 1,057,305 | -59.35% |
| 6/30/2023 | 45,997,442 | 38,189,725 | (7,807,717) | (7,083,472) | 978.05% |
| 7/14/2023 | 78,310,429 | 77,915,214 | (395,215) | 7,412,502 | -94.94% |

58.    This table reflects for each Report Date, the number of Mullen shares

Defendant NFS reported to Broadridge, the number of Mullen shares held at

DTCC in Defendant NFS' account, it's Imbalance (the number of Broadridge

reported shares less the shares actually at DTCC), the Imbalance Share Change

between reporting periods and the Imbalance Percentage Change between

reporting periods.  Defendant NFS maintained persistent large Imbalances between

the amount of Mullen shares in its account at the DTCC and the number of

beneficially owned Mullen shares that it reported to Broadridge during the

Relevant Period.

59.    During the period of June 15, 2023 to June 30, 2023, Defendant NFS'

Imbalance total increased by approximately 7 million shares or 978%. During the

period of June 30, 2023 to July 14, 2023, Defendant NFS' Imbalance total

decreased by approximately 7.4 million Mullen shares. This decrease in the

Imbalance amount of Mullen shares coincided with the issuance of over 600

million shares into the DTCC by Mullen.

60.    A strong inference can be drawn that Defendant NFS used the newly

issued Mullen shares to reduce their Imbalance.  A strong inference can also be

drawn that Defendant NFS was unlawfully crediting customer accounts with

fictitious Mullen shares in violation of Rule 15c3-3, as Defendant NFS anticipated

the issuance of new Mullen shares and was violating Rule 14b-1 by overreporting

to Broadridge the current number of beneficially owned shares of Mullen that it

was holding in safekeeping accounts for its customers. There were in fact

insufficient actual Mullen shares in Defendant NFS' DTCC account to fulfill its

obligation to its customers. Defendant NFS then deposited them into customer

safekeeping accounts when new Mullen shares were issued.  This conduct

continued throughout the Relevant Period.

### E.   Defendants and the John Doe Defendants Consciously or Recklessly Ignored FINRA's Rules and Regulations Concerning Maintaining Supervisory and Compliance Procedures and Controls

61.   The Defendants and the John Doe Defendants were subject to the core supervisory and compliance obligations under applicable FINRA rules.  In particular, FINRA Rule 3110 requires member firms to "establish and maintain a system" of supervision that is "reasonably designed to achieve compliance with applicable securities laws and regulations." Among other things, the rule requires written supervisory procedures, the appointment of qualified supervisors and the implementation of reviews at least annually to detect and prevent violations of, and achieve compliance with, applicable securities laws, regulations, and rules. The compliance program specifically must include periodic examinations that test and verify the member's policies and procedures (including supervisory policies and procedures) for safeguarding customer funds and securities, and maintaining accurate books and records. FINRA Rule 3120 reinforces the requirements of Rule 3110 by requiring firms to test and verify that their supervisory procedures are reasonably designed to achieve compliance with the applicable laws, regulations, and rules.  Rule 3130 requires the broker's chief executive officer to certify that it has in place processes to ensure compliance.

62.   Additional rules pertain specifically to the Defendants: compliance with the Customer Protection Rule (FINRA Rule 4330); verifying the count of

securities held on at least a quarterly basis or more frequently "where prudent business practice would so require" (FINRA Rule 4522); and calculating and reporting the firm's net capital on a regular basis (FINRA Rule 4521).

63.   Here, the supervisory and compliance procedures would have included, *inter alia,* protocols ensuring that there were appropriate communications and coordination among the various persons and groups tasked with implementing and carrying out possession and control functions; conducting periodic comprehensive reviews to detect segregation failures caused by system or human failures; creating compliance tools that were reasonably designed to monitor activity and identify instances where the possession or control requirements were not functioning as intended; implementing reasonably designed procedures to test segregation processes; conducting independent reviews of automated daily segregation functions; and periodically testing possession and control systems for different classes of securities.  Defendants and the John Doe Defendants either recklessly failed to properly implement these systems or consciously ignored their application.

## V.   LOSS CAUSATION AND STANDING

64.   During the Relevant Period, Mullen sold not less than 185 million shares to shareholders at market prices that were manipulated and depressed by Defendants and the John Doe Defendants.

65.     Plaintiff Novoa sold his Mullen shares into a market at share prices that were artificially manipulated and depressed by Defendants and the John Doe Defendants.  Plaintiff Novoa purchased shares of Mullen (adjusted for reverse splits) between July 14, 2022 and August 16, 2023 and sold them on August 25, 2023, incurring a loss on the sale.

**First Claim for Relief**
**(For Violations of Section 10(b) of the Exchange Act**
**and Rules 10b-5(a) and (c) Promulgated Thereunder)**

66.     Plaintiffs incorporate by reference paragraphs 1 through 65 as if fully set forth herein.

67.     During the Relevant Period, Defendants and the John Doe Defendants engaged in and employed devices, schemes, illegal acts, practices, and a course of conduct that was intended to artificially affect market activity and manipulate the price of Mullen securities.  Defendants' and the John Doe Defendants' unlawful conduct operated as a fraud on the market and caused Plaintiffs to suffer financial losses in connection with the sale of their securities in the market.

68.     Defendants' and the John Doe Defendants' manipulative conduct during the Relevant Period included, but was not limited to: (i) facilitating the short selling of Mullen securities without properly complying with Reg SHO's locate and borrow requirements; (ii) ignoring regulatory consequences that arise from large numbers of either public Fails-to-Deliver through Naked Short Selling

or internalized Fails-to-Deliver through Synthetic Naked Short Selling; (iii)

facilitating a fraud on the market by enabling themselves and/or their short selling

customers to engage in Naked Short Selling and Synthetic Naked Short Selling,

which in turn injected false and misleading information into the market that

depressed the price of Mullen's stock; and (iv) failing to establish and maintain a

system of monitoring and supervision that is reasonably designed to achieve

compliance with applicable securities laws and regulations, including FINRA

Rules 3110, 3120, 4330, 4521 and 4522

69.     Each Defendant's manipulative conduct during the Relevant Period

also included: (i) unlawfully loaning or using customer segregated shares from

Safekeeping Accounts in violation of  Rule 15c3-3 a/k/a Customer Protection Rule

to facilitate short-selling which violated Reg SHO and interpretive guidance

thereunder that prohibits sham transactions designed to give the appearance of

actual compliance; (ii) hiding or internalizing Fails-to-Deliver that would have

placed Mullen on the Threshold List or in the Penalty Box, thus curtailing short-

selling and the enormous profit that Defendants realized from unlawfully using and

lending customer shares; (iii) concealing their violation of Rule 15c3-3 by

overreporting to Broadridge the amount of Beneficially Owned shares in their

possession or control in violation of Rule 14b-1, which had the effect of creating

two sets of books and records in violation of Exchange Act Rules 17a(3) and (4);

and (iv) mailing account statements to customers containing false information concerning the amount of fully paid for shares they were actually holding in safekeeping accounts.

70.    These factors drove Mullen's share price down, thereby enabling Defendants and the John Doe Defendants to realize illegal trading profits while avoiding borrowing costs.  Based on the size and duration of the Imbalances, each Defendant knew or recklessly ignored that their conduct violated regulatory requirements.  The John Doe Defendants also knew or recklessly ignored that their unlawful Naked Short Selling created Fails-to-Deliver which violated the locate and borrow requirements of Reg SHO.

71.    The persistent, high-volume short selling that resulted from Defendants' and the John Doe Defendants' reckless and unlawful conduct drove down the price of Mullen stock to the point that Mullen was forced to execute two reverse splits of its shares.

### Scienter – There is Strong Circumstantial Evidence That Defendants' and the John Doe Defendants Acted Knowingly or Recklessly

72.    Defendants' and the John Doe Defendants' conduct did not reflect inadvertent anomalies, innocent accidents, or "one-off" errors.  Rather, their conduct, which occurred throughout the Relevant Period, represented a continuous and sustained departure from the standards of care that each Defendant and each

John Doe Defendant was required to provide as registered broker-dealers under the federal securities laws and industry rules and regulations.

73.     Defendants' and the John Doe Defendants' unlawful short selling created an artificial supply of Mullen securities available for trading, which misled investors by creating a false impression of how investors valued Mullen securities. Defendants and the John Doe Defendants engaged in this unlawful conduct for the purpose of depressing the price of these shares and masked their misconduct by not reconciling the Imbalance that existed.

74.     As registered broker-dealers, each Defendant and each John Doe Defendant knew or recklessly ignored the fact that their conduct violated the Federal securities laws, and the rules and regulations of the securities industry.  As registered broker-dealers, Defendants and the John Doe Defendants were required to have detailed policies and procedures governing the proper conduct of their affairs.  As such, Defendants and the John Doe Defendants knew or recklessly ignored their obligations under the relevant regulations that constitute the predicate acts of their manipulations, including Reg SHO, Rules 15c3-3 and Rule 14b-1. SEC and FINRA rules also explicitly required the Defendants and the John Doe Defendants to have procedures and processes that were reasonably designed to detect and prevent violations of those regulations and rules, and to conduct periodic reviews that would validate the effectiveness of their policies and

procedures.  The nature, purpose, and effect of their conduct over an extended period of time therefore supports a strong inference of conscious misbehavior or recklessness.  Specifically, Defendants knew or should have known that:

A.     It was a violation of Reg SHO for Defendants to execute short-sale orders without reasonably being able to locate bona fide shares and to timely deliver shares that could be lawfully borrowed by the settlement date of the transaction;

B.     It was a violation of Rule 15c3-3 for Defendants to circumvent Reg SHO violations by using fully paid for customer shares for any purpose, including compliance  with Reg SHO;

C.     It was a violation of Rule 14b-1 for Defendants to overreport the amount of Beneficially Owned and fully paid for customer shares that were in their Good Custody and Control, in order to increase the supply of shares that could be sold or loaned to short sellers;

D.     "Hiding" Fails-to-Deliver by using shares that were ineligible for delivery to counterparties would subvert the purposes of Reg SHO's locate and borrow requirements;

E.     Preventing "natural" Fails-to-Deliver would send materially misleading signals to the market regarding the state of the market for Mullen's stock;

F.     It was a violation of FINRA Rules 3110, 3120, 4330, 4521 and 4522 for Defendants to facilitate Synthetic Naked Short Selling or permit the use of segregated customer shares for delivery to settle short sales; and

G.     It was a violation of FINRA Rules 3110, 3120, 4330, 4521 and 4522 for Defendants to allow the Imbalances between the DTCC and Broadridge counts of Beneficially Owned shares to persist without taking remedial actions to reconcile the discrepancy.

75.    The John Doe Defendants also knew or should have known that:

A.     It was a violation of Reg SHO for the John Doe Defendants to execute short-sale orders without reasonably being able to locate bona fide shares and to timely deliver shares that could be lawfully borrowed by the settlement date of the transaction; and

B.     It was a violation of FINRA Rules 3110, 3120, 4330, 4521 and 4522 for the John Doe Defendants to facilitate Naked Short Selling.

76.     Defendants and the John Doe Defendants each had an economic motive to orchestrate their schemes which included (a) allowing themselves or their clients to make illicit profits in connection with the unlawful short selling of Mullen securities; (b) unlawfully using customer shares to make deliveries on shorts/fails and save borrowing costs (if a broker actually borrowed shares from a customer, the broker would credit the customer for either the cash equivalent or the interest of the cash equivalent-by just using shares); (c) unlawfully loaning customer shares to earn fees for stock lending and/or (d) accommodating their clients to insure continuity of business.

**Defendants Used National Securities Exchanges and the
Mail to Perpetrate Their Market Manipulation Scheme**

77.     Each Defendant and each John Doe Defendant used the means or instrumentalities of interstate commerce, the facilities of a national securities exchange, and the mail, to purchase and sell Mullen securities.

78.     Defendants and the John Doe Defendants each knowingly employed devices, schemes, or artifices to defraud and engage in acts, practices, and a course of conduct which operated as a fraud or deceit upon Mullen and the market.

**Plaintiffs' Damages Were Caused by Their
Reliance on an Efficient Market Free of Manipulation**

79.     Mullen securities were intended to be traded in an efficient market.

Plaintiffs relied upon the assumption that the market was free from manipulation

when they sold their securities, and that the market price of Mullen's securities

would be determined by the natural forces of supply and demand rather than

inaccurate information injected into the marketplace by the Defendants and the

John Doe Defendants who were engaged in a scheme to distort the price of Mullen

securities for their own and/or their customers' benefit.

**Plaintiffs Suffered Damages as a Result
of Defendants' Market Manipulation Scheme**

80.     As a direct and proximate result of Defendants' and the John Doe

Defendants' schemes, devices and manipulative conduct, Plaintiffs have been

damaged in an amount that is presently undetermined.  Plaintiffs' damages are

directly attributable to Defendants' and the John Doe Defendants' unlawful

conduct, which caused a material diminution in the price of their Mullen securities

from a high of $1.47 to a low of $0.11 during the Relevant Period.  In light of how

similar Defendants' and the John Doe Defendants' conduct was during the

Relevant Period, it is not plausible that Defendants' and the John Doe Defendants'

schemes, devices, and manipulative conduct were inadvertent anomalies, accidents

or "one-off" errors.  A strong inference can be drawn from their parallel conduct, that each Defendant and each John Doe Defendant intended to deceive investors by artificially affecting the market price of Mullen shares.

81.    By reasons of the foregoing, Plaintiffs seek to recover damages for the loss that Defendants' conduct caused them to suffer, by violating Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder.

## Second Claim For Relief - Unjust Enrichment

82.    Plaintiffs incorporate by reference paragraphs 1 through 81 as if fully set forth herein.

83.    Defendants and the John Doe Defendants financially benefitted from their unlawful acts.  As alleged herein, Defendants manipulated the market prices of Mullen securities during the Relevant Period by unlawfully Synthetic Naked Short Selling and/or unlawfully lending to short sellers or using for themselves, customer segregated shares that were required to be held in safekeeping accounts. These shares were not available to be used for short-selling or any other purpose by Defendants or their customers.

84.    To conceal their unlawful conduct, each Defendant intentionally overreported to Broadridge the number of Beneficially Owned shares of Mullen that they claimed to be holding, in comparison to the number of Beneficially Owned Mullen shares each Defendant actually held at DTCC.

85.    The John Doe Defendants manipulated the market prices of Mullen securities during the Relevant Period by unlawfully Naked Short Selling without locating or borrowing shares.

86.    The use of fictitious Mullen shares by Defendants and the John Doe Defendants, that were not authorized for short selling caused the daily short selling of Mullen shares to frequently exceed 55% of the daily trading volume of Mullen's shares during the Relevant Period when the industry norm is daily short selling between 25% and 30%.

87.    The excessively high percentage of short selling of Mullen's shares sent a false and misleading signal to the marketplace that Mullen shares were overpriced and were available to be lawfully used for short selling.

88.    These unlawful acts caused Plaintiffs to suffer financial injury, by being forced to sell Mullen shares at artificially low prices.

89.    As a result of the foregoing, it is unjust and inequitable for Defendants and the John Doe Defendants to have enriched themselves in this manner at the expense of Plaintiffs.  Under the facts and circumstances of this case, equity and good conscience require Defendants and the John Doe Defendants to make restitution.

90.    Each Defendant and John Doe Defendant should pay restitution for its own unjust enrichment to Mullen.

## **Third Claim For Relief - Injunctive Relief**

91.     Plaintiffs incorporate by reference the preceding allegations contained in paragraphs 1- 90 as if fully set forth herein.

92.     Plaintiffs seek to permanently enjoin Defendants and the John Doe Defendants from engaging in market manipulation conduct that affects Mullen's share price.  Defendants' and the John Doe Defendants' actions have caused, continue to cause, and will continue to cause future permanent and irreparable harm to Plaintiffs.

93.     The balance of the equities favors an injunction to prevent Defendants and the John Doe Defendants from continuing to manipulate Mullen's share price. The harm to Plaintiffs is significant. In contrast, the potential harm to Defendants of an injunction is insignificant; Defendants and the John Doe Defendants would merely be required to halt their illegal activities.

94.     Thus, the public interest is best served by enjoining Defendants and the John Doe Defendants behavior.

95.     As noted throughout this complaint, it is extremely likely that Plaintiffs will succeed on the merits in this case.  All evidence to be presented, including trading records and Defendants' and the John Doe Defendants' own trading algorithms, will support the position that Defendants and the John Doe Defendants have manipulated Mullen's share price.

96.     As such, this court should enter a permanent injunction enjoining Defendants and the John Doe Defendants from engaging in the type of market manipulation set forth herein and any other illegal manipulative conduct that affects Mullen's share price.

## VI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment:

A. Finding that Defendants and the John Doe Defendants violated the Federal securities and New York State laws as alleged in this complaint;

B. Ordering Defendants and the John Doe Defendants to pay damages as a result of their unlawful conduct in an amount to be determined at trial;

C. Ordering permanent injunctive relief as described herein;

D. Awarding reasonable attorney's fees and costs together with all available pre and post judgment interest; and

E. Granting such other and further relief as the Court deems just and appropriate.

## VII.   **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action for all issues so triable.

Dated:  August 29, 2023
        New York, New York

                            Respectfully submitted,

                    By:     _Alan M. Pollack_____
                            Alan M. Pollack
                            Felicia S. Ennis
                            Warshaw Burstein, LLP
                            575 Lexington Avenue, 7th Floor
                            New York, New York 10022
                            Tel:  (212) 984-7700
                            Fax:  (212) 956-2164


                                    and

                            James W. Christian
                            Christian Attar, LLC
                            2302 Fannin, Suite 500
                            Houston, Texas 77002
                            Tel:  (713) 659-7616
                            Fax:  (713) 659-7641